UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Thomas F. Kuduk,

      Plaintiff,

v.

                            **MEMORANDUM OPINION
AND ORDER**
Civil No. 12-276 (MJD/AJB)

BNSF Railway Co.,

      Defendant.

_____

      Louis E. Jungbauer and Justin N. Brunner, Yaeger, Jungbauer & Barczak PLC, Counsel for Plaintiff.

      Bruce J. Douglas and Ashley A. Wenger, Ogletree, Deakins, Nash, Smoak & Stewart, P.C., Counsel for Defendant.

_____

## I.      Introduction

      This matter is before the Court on Defendant BNSF Railway Co.'s

("BNSF") motion for summary judgment.  For the reasons discussed below, the

Court will grant the motion.

## II.      Background

      Plaintiff was an employee of BNSF from 1968 to September 2010.  During

his tenure, he worked in a variety of positions, including brakeman, switchman,

conductor and conductor-trainer for new hires.

Plaintiff was a dependable and respected employee.  In December 2009, however, he made a mistake that caused him to be placed on probation.  Specifically, Plaintiff did not line up a derail, and as a result, a car derailed off the track when his crew shoved it over.  Plaintiff took responsibility for the derailment, and signed a waiver giving up his right to a formal investigation hearing.  The waiver, dated December 29, 2009, specifically warned Plaintiff that he would be placed on probation for one year, and that any rules violation during the probationary period could result in further disciplinary action. (Wenger Decl., Ex. A.)

On May 17, 2010, BNSF Trainmaster Greg Jaeb conducted a banner test on Plaintiff.  A banner test is designed to determine whether Plaintiff's crew was going slow enough to be able to stop the train within half of the range of vision. (Brunner Decl., Ex. 15 at BNSF004697.)  Plaintiff passed the test, but believed that Jaeb conducted the test improperly, because rather than violently waving a visible stop signal, Jaeb kept his red flag rolled up on its stick.  (Id., Ex. 46 (Plaintiff Dep. at 211-12, 215); Ex. 47 (Jaeb Dep. 145-46).)  Jaeb believes the flag may have been rolled a little, but was otherwise unfurled.  (Id., Ex. 47 (Jaeb Dep.

at 145-46).)  Plaintiff complained to his union representative, Mike Wold, about

Jaeb's banner test.

Plaintiff's complaint about the banner test was brought up at a safety

meeting on May 19, 2010 by Wold.  The minutes of this meeting indicate that a

determination was made that Jaeb's banner test was proper, as the test requires

only that any object be violently waved.  (Brunner Decl., Ex. 5 at 3.)

On May 24, 2010, Plaintiff submitted a safety concern to the BNSF Twin

Cities Division Safety Team about a particular derail that had a short, flop-over

type handle that was heavy to throw, which could cause a possible back injury.

(Id., Ex. 6.)  Plaintiff suggested that the handle be replaced.  This safety concern

was forwarded to Jaeb, who investigated and found on June 5, 2010 that the

handle met the requirements for the industry[1] when the warehouse was built, but

that he would request the industry to replace the handle.  (Id., Ex. 9.)

Thereafter, Jaeb conducted operations tests on Plaintiff on June 4 and 7,

2010. (Id., Ex. 4.)  It appears that he passed these tests, but that on June 9, 2010,

Plaintiff was observed to have "fouled the tracks."  (Id.)  "Fouling the tracks"

---

[1]As used herein, the term "industry" refers to portions of the track that are owned or controlled by the specific industry that is serviced by BNSF.  In this case, the industry refers to Anheuser Busch.

3

occurs when an employee walks between the rails or in such close proximity to a track that the employee could be struck by a train.  49 C.F.R. § 214.7.  BNSF's Train, Yard & Engine Safety Rules ("TY&E Safety Rules") specifically warns against fouling the tracks "except when duties require and proper protection is provided.  Use caution during bad weather and when visibility is impaired." (Wenger Decl., Ex. V (TY&E Safety Rules S-13.1.13(C).)  BNSF has characterized fouling the tracks "before ensuring there is no movement" as one of "Eight Deadly Decisions."  (Id., Ex. W.)  BNSF asserts that the Eight Deadly Decisions are featured in training videos, included in company posters and printed on pocket cards and given to each employee.  (Id., Ex. E (Plaintiff Dep. at 38-40).) Plaintiff testified that he was aware of the Eight Deadly Decisions and that violations were a Level S ("Serious") offense.  (Id. at 38-40, 78-81 and 87.)

On June 9, 2010, two Trainmasters observed Plaintiff walking between rails on Track 190 of the Amber subdivision near Hinckley, Minnesota.  The Trainmasters, Greg Jaeb and Larry Mattison, were traveling in Jaeb's truck northbound on the highway adjacent to Track 190 towards the Hinckley Depot. (Id., Ex. F (Mattison Dep. at 11, 19 and 30); Ex. D (Jaeb Dep. at 166-67, 170).) Mattison first observed an employee standing or walking in between the rails on

4

Track 190, and told Jaeb, who was driving the truck, to pull over.  (Id., Ex. F (Mattison Dep. at 32).)  Mattison and Jaeb then got out of the truck, donned protective gear, and crossed the road and entered the railroad right-of-way and ran towards the employee while yelling at him to get out of the middle of the track.  (Id., Ex. F (Mattison Dep. at 38); Ex. D (Jaeb Dep. at 173).)

Mattison and Jaeb assert that the employee, who upon closer examination Jaeb identified as Plaintiff, kept walking in the middle of the track after they began yelling at him, but that he eventually moved to the side of the track.  (Id., Ex. F (Mattison Dep. at 45-47); Ex. D (Jaeb Dep. at 175, 201-03).)  Mattison and Jaeb assert that when Plaintiff was asked why he was walking in the middle of the track, Plaintiff became argumentative, insisting that he was doing so because it was the safest place to walk.  (Id., (Ex. F (Mattison Dep. at 51, 53); Ex. D (Jaeb Dep. at 177-78, 205).)  After Mattison pointed out that they were walking on the ballast/right-of-way of the track, and that he took no exception to the ground conditions, Plaintiff became apologetic, saying "I'm sorry.  I only got a year left. I'll never do it again."  (Id., Ex. F (Mattison Dep. at 51-53); Ex. G (Investigation Hearing Tr. at 39); Ex. E (Plaintiff Dep. at 138-39, 176-77).)  Mattison then reported the incident to his superior, Richard Ebel.  (Id. Ex. I (Ebel Dep. at 41-42).)

Plaintiff asserts that on the day he was accused of fouling the tracks, he was riding on the point of a train shove, stopped the movement, and got permission to get off and remove an end of train device.  (Brunner Decl., Ex. 19 (Jensen statement); Ex. 30 (Investigation Hearing Tr. 34).)  Plaintiff asserts he then left the device about four car lengths north of the north crossing on the highway side of Track 190, to eventually be placed on the four cars that were being left on Track 191.  (Id., Ex. 30 (Investigation Hearing Tr. at 34, 46); Ex. 46 (Plaintiff Dep. at 119).)  Plaintiff asserts that walking was a part of the duties of a brakeman like Plaintiff, and that he does it all the time at locations such as Tracks 190 and 191 - a fact that BNSF does not dispute.  (Id., Ex. 39; Ex. 47 (Jaeb Dep. at 194-95; Ex. 16 (Job Description); Ex. 30 (Investigation Hearing Tr. at 20).)  Jaeb admitted during his deposition that Plaintiff told him he was on his way to pick up the rear end device and that picking up and attaching these devices is an important part of the duties of a brakeman.  (Id., Ex. 47 (Jaeb Dep. at 187-89).)

Plaintiff claims that he chose the safest path to reach the end of train devices.  He observed that the walking conditions were unsafe and that the ballast was bad on the highway side of Track 190.  He further observed in the area between Track 190 and 191, there was also ballast that Plaintiff reasonably

feared would cause him to be injured since he had stumbled there days before.

(Id., Ex. 30 (Investigation Hearing Tr. 35, 50-51); Ex. 33 (PEPA Board excerpt at

NBSF002007); Ex. 46 (Plaintiff Dep. at 126-28).)  Plaintiff asserts that to avoid

those hazards, he walked about one car length between the rails, then cut

between the two tracks for a couple of car lengths, and ended upon going back

between the rails again to reach the end of train devices.  (Id., Ex. 30

(Investigation Hearing Tr. 40); Ex. 46 (Plaintiff Dep. at 130, 143-44).)

Plaintiff further asserts that he took all necessary steps to protect against

cars on the track.  He applied handbrakes, opened the angle cock to release the

air brakes and put them into emergency and chocked the wheels.  Plaintiff asserts

the fact that the cars did not move is verification that he followed the rules.

Plaintiff asserts that Jaeb did not check the holding power of the handbrake or

the emergency brakes, let alone show they were insufficient to prevent

movement.  Plaintiff further asserts there is no evidence in the record that the

brakes were defective.  Nevertheless, Plaintiff asserts that he kept glancing

behind him to ensure that he continued to be protected from movement on Track

190.

Jaeb reported that Plaintiff "fouled the tracks" which initiated the

discipline process.  While the investigation was pending, Plaintiff asserts he

moved to a different, lower-paying position in order to avoid Jaeb.  (Brunner

Decl., Ex. 29.)  In the meantime, Plaintiff asserts that the safety issue he reported

on May 24, 2010 regarding a derail with a heavy handle continued to plague Jaeb.

By July 26, 2010, the cost of the repair increased from $1,000 to $2,000 and the

industry had not yet agreed to pay the repair. (Id., Ex. 9.)

     The hearing on Plaintiff's violation was held on September 8, 2010.  (Id.,

Exs. 28 at BNSF001247.)  The hearing had been postponed several times to allow

the parties to negotiate a settlement.  (Wengler Decl., Ex. J (Lund Dep. at 49-54).)

In fact, a settlement deal was brokered between BNSF and the union that would

have allowed Plaintiff to sign a second waiver and be reinstated to a low-risk

position in the yard until his planned retirement, which was only months away.

(Id.)  Plaintiff rejected this offer and elected to proceed to the investigation

hearing.  (Id., Ex. I (Ebel Dep. at 54-57).)

     At the hearing, Plaintiff was represented by two union representatives of

his choice and had the opportunity to testify, to present witnesses and to enter

exhibits on his behalf.  (Id., Ex. G (Investigation Hearing Tr and Exhibits).)

Trainmasters Jaeb and Mattison testified at the hearing.  (Id. at 14, 25-26.)

8

Plaintiff testified that he was justified in walking between the rails because in his judgment, it was the safest place to walk and that he had established sufficient protection to avoid being struck by a train.  (Id. at 36-39.)

Following the hearing, the transcript and exhibits were sent to Richard Ebel, General Manager of the Twin Cities Division.  (Id., Ex. I (Ebel Dep. at 61-63.) Based on his review of the evidence, Ebel determined that dismissal was warranted.  (Id. at 59.)  Before a final decision was made, Ebel consulted with Jim Hurlburt from BNSF's labor relations.  (Id. at 93.)  Hurlburt told Ebel he had no exceptions to the decision to terminate Plaintiff's employment.  (Id. at 94.)  Before a dismissal takes place, approval is required by the regional vice president, Sam Sexhus.  (Id. at 95.)  Sexhus approved the decision to dismiss Plaintiff.  (Id. at 95-96.)  Plaintiff was then notified of his dismissal by letter dated September 17, 2010.  (Id. Ex. L.)  Following his dismissal, several appeals and negotiations took place.  Ultimately, on April 21, 2011, the parties reached an agreement whereby BNSF would reinstate Plaintiff on paper through June 1, 2011 - Plaintiff's planned retirement date - so that he could retire with full benefits.  (Id. Ex. P.)

Prior to the settlement, however, and allegedly unbeknownst to BNSF and the union representatives, Plaintiff filed a complaint with OSHA pursuant to the

Federal Rail Safety Act ("FRSA"), 49 U.S.C. § 20109 (d)(1).  (<u>Id.</u> Ex. Q (OSHA

Complaint dated March 15, 2011).)  On February 1, 2012, after the requisite 210

day time period had elapsed since his initial OSHA filing without the issuance of

a final decision from the Secretary of Labor, Plaintiff filed this action pursuant to

§ 20109 (d)(3).

## III.    Standard for Summary Judgment

Summary judgment is appropriate if, viewing all facts in the light most

favorable to the non-moving party, there is no genuine dispute as to any material

fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

P. 56(a); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  The party seeking

summary judgment bears the burden of showing that there is no disputed issue

of material fact.  <u>Celotex</u>, 477 U.S. at 323.  "A dispute is genuine if the evidence is

such that it could cause a reasonable jury to return a verdict for either party; a

fact is material if its resolution affects the outcome of the case."  <u>Amini v. City of

Minneapolis</u>, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing <u>Anderson v. Liberty

Lobby, Inc.</u>, 477 U.S. 242, 248, 252 (1986)).

## IV.    Federal Rail Safety Act

Pursuant to FRSA, a railroad carrier cannot discipline or discriminate

against an employee if such discipline or discrimination is based, in whole or in

part, on the employee's lawful, good faith act, done or perceived by the employer

to have been done or about to be done:

> (1) to provide information, directly cause information to be provided, or
> otherwise directly assist in any investigation regarding any conduct which
> the employee reasonably believes constitutes a violation of any Federal
> law, rule, or regulation relating to railroad safety or security, or gross
> fraud, waste, or abuse of Federal grants or other public funds intended to
> be used for railroad safety or security, if the information or assistance is
> provided to or an investigation stemming from the provided information is
> conducted by--

> > * * *
> > (C) a person with supervisory authority over the employee or such
> > other person who has the authority to investigate, discover, or
> > terminate the misconduct;

> * * *

49 U.S.C. § 20109(a)(1)(C).

In addition, FRSA prohibits a railroad carrier from disciplining or

discriminating against an employee for:

> (A) reporting, in good faith, a hazardous safety or security condition;

> (B) refusing to work when confronted by a hazardous safety or security
> condition related to the performance of the employee's duties, if the
> conditions described in paragraph (2) exist; or

> (C) refusing to authorize the use of any safety-related equipment, track, or
> structures, if the employee is responsible for the inspection or repair of the

equipment, track, or structures, when the employee believes that the equipment, track, or structures are in a hazardous safety or security condition, if the conditions described in paragraph (2) exist.

49 U.S.C. § 20109(b)(A)-(C).

In his Complaint, Plaintiff alleges that he engaged in various protected activity during his employment with BNSF, including but not limited to:

1) on or around May 19, 2010, Plaintiff provided information in an investigation regarding Jaeb's failure to notify employees when Jaeb was approaching them during their work and wanted them to stop working; and

2) on or around May 24, 2010, Plaintiff provided information in an investigation regarding a handle on a piece of railroad equipment at Anheuser-Busch that Plaintiff believed posed a risk of injury to employees[2].

Plaintiff asserts that a reasonable jury could find that his termination on September 17, 2010 is causally related to the protected activity described above. Plaintiff further alleges that due to his wrongful termination, he suffered

_____

[2]In his Complaint, Plaintiff also listed an incident that involved a conversation between Plaintiff, Jaeb and FRA Inspector John Smullen on June 7, 2009 regarding whether Plaintiff should have to adhere to a safety rule regarding clearance when placing railcars on a curved area of track.  As Plaintiff does not discuss this incident in his opposition to summary judgment, the Court finds that Plaintiff has abandoned this part of his claim.

damages in the form of lost wages, fringe benefits and out-of-pocket expenses for

medical care and insurance.  Plaintiff further asserts he has suffered pain and loss

of enjoyment of life, and that he will continue to incur compensatory damages in

the form of attorneys' fees, expert witness fees and litigation costs.  Finally,

Plaintiff asserts he is entitled to an award of punitive damages.

FRSA incorporates by reference the rules and procedures applicable to the

Wendell H. Ford Aviation Investment and Reform Act for the 21st Century

("AIR-21") whistleblower cases.  Araujo v. New Jersey Trans. Rail Op., Inc., 708

F.3d 152, 157 (3d Cir. 2013).  To establish a prima facie claim of retaliation under

FRSA, an employee must show by a preponderance of the evidence that he 1)

engaged in protected activity; 2) that the employer knew he engaged in protected

activity; 3) he suffered an unfavorable personnel action; and 4) the protected

activity was a contributing factor in the unfavorable action.  Id. (citing Allen v.

Admin. Review Bd., 514 F.3d 468, 475-76 (5th Cir. 2008)).

> Once the plaintiff makes a showing that the protected activity was a
> "contributing factor" to the adverse employment action, the burden shifts
> to the employer to demonstrate "by clear and convincing evidence, that the
> employer would have taken the same unfavorable personnel action in the
> absence of that behavior."

Id.; 29 CFR § 1982.104(e)(4); see also, 29 CFR § 1982.109(a), (b); Procedure for

<u>Handling of Retaliation Complaints</u>, 75 Fed. Reg. 53522-01, 2010 WL 3392070 at

*53524-53525.

     **A.**     **Prima Facie Case**

     **1.**     **Protected Activity**

The parties dispute whether Plaintiff engaged in protected activity as

defined under FRSA.  Plaintiff asserts that reporting his concerns about the

banner test conducted by Jaeb on May 17, 2010 is protected activity covered by

FRSA, because Plaintiff reasonably believed that the manner in which Jaeb

conducted the banner test violated a safety law or regulation.

BNSF asserts that Plaintiff's report about the manner in which Jaeb

conducted a banner test on May 17, 2010 was not protected activity because the

report did not concern a safety violation, it concerned only an allegedly improper

operations test, and because Plaintiff reported this incident to Mike Wold, who

did not have the necessary supervisory or investigative authority to bring the

complaint within the realm of statutorily protected conduct.  49 U.S.C. §

20109(a)(2).  In addition, Plaintiff did not attend the safety committee meeting at

which this report was discussed.  Thus, if anyone made a "report" it was Wold -

who brought up the banner test at the safety meeting.

The Court agrees that FRSA requires an employee to report a safety concern to a "person with supervisory authority over the employee or such other person who has the authority to investigate, discover, or terminate the misconduct." Plaintiff's report concerning the banner test was to made his union representative Mike Wold. There is no evidence before the Court that Wold was Plaintiff's supervisor or that he had the authority to investigate, discover or terminate the misconduct. Accordingly, the Court finds that the report concerning the banner test is not protected activity as defined in FRSA.

With respect to Plaintiff's report of a defective  derail handle at the Anheuser-Busch facility, Plaintiff asserts that the report was protected activity under FRSA because he reasonably believed the handle posed a risk of injury to employees.

BNSF argues Plaintiff's report concerning this piece of equipment did not constitute protected activity because Plaintiff did not have a good faith belief that the derail handle posed a hazardous safety condition in violation of federal law, rule or regulation as would be required in order to garner protection under FRSA. When questioned at his deposition whether he was making a safety complaint, Plaintiff responded that was a "tough question" but that Plaintiff

believed the handle was nonetheless defective.  (Wengler Decl., Ex. E (Plaintiff

Dep. at 249).)  BNSF asserts that if Plaintiff believed the handles constituted a

hazardous safety condition, Plaintiff was obligated to "bad-order tag" the handle

so that it was taken out of commission immediately.  (Id., Ex. M (Hamell Dep. at

45-46); Ex. J (Lund Dep. at 29-30).)  BNSF asserts that as Plaintiff was a trainer for

new hires, he was well aware of the import of bad-order tagging and attendant

safety concerns.  (Id. Ex. M (Hamell Dep. at 45-46).)

The Court finds that when viewing the facts in the light most favorable to

Plaintiff, Plaintiff has demonstrated that factual issues exist as to whether he, in

good faith, reported a hazardous safety or security condition, when he reported

the faulty derail handle to the BNSF Twin Cities Division Safety Team.

## 2.    Knowledge

Plaintiff asserts that for purposes of establishing a prima facie case, the

pertinent inquiry is whether Jaeb had knowledge of Plaintiff's protected activity.

In support, Plaintiff cites to the Supreme Court's decision in Staub v. Proctor

Hospital, 131 S.Ct. 1186 (2011), in which the Court considered the circumstances

under which an employer may be liable for employment discrimination based on

the discriminatory animus held by an employee who influenced, but did not

make, the ultimate employment decision.  The Court held that "if a supervisor performs an act motivated by [discriminatory] animus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under [the relevant federal law]."  Staub, 131 S.Ct. at 1194.  Because there was evidence[3] that showed that the supervisors in question had the specific intent to cause the plaintiff to be terminated, and because the actions of the supervisors were causal factors in the decision to terminate plaintiff's employment, the Court held the employer was liable.  Id.

As applied to the facts of this case, Plaintiff argues a reasonable jury could find that Jaeb was a supervisor that had sufficient knowledge of Plaintiff's protected activity.  Further, Plaintiff asserts that BNSF considered Jaeb's testimony at the investigation hearing upon which the decision to terminate his employment was based.  Plaintiff argues it is therefore reasonable to infer that Jaeb's testimony contributed to the decision to terminate his employment in

---

[3]For example, there was evidence that plaintiff's supervisor scheduled the plaintiff for extra shifts "as payback" for other employees having to cover plaintiff's shift while he was on military leave, that the supervisor complained that plaintiff's military leave put a strain on the department, and that the supervisor was "out to get" plaintiff.

retaliation for reporting safety issues that concerned or involved Jaeb.

The Court finds that Plaintiff's reliance on <u>Staub</u> is misplaced, as <u>Staub</u> applied the "motivating factor" test, while claims under FRSA are determined by the "contributing factor" test. As discussed below, the "contributing factor" test does not require Plaintiff to prove retaliatory animus. Even if such a showing was required, Plaintiff has failed to make any showing that Jaeb had a specific intent to cause Plaintiff to be terminated, or that Jaeb held, or spoke of, a bias or animus toward Plaintiff because Plaintiff participated in a protected activity.

The Court finds that the decision to terminate Plaintiff was made by Richard Ebel, which decision was approved by higher management. Plaintiff has submitted no evidence that Ebel or anyone in higher management that reviewed the dismissal decision had actual or constructive knowledge of Plaintiff's protected activity.

### 3. Contributing Factor

As noted above, the applicable standard of proof for retaliation claims under FRSA is whether the protected activity was a contributing factor in the unfavorable action. The "contributing factor" standard does not require a plaintiff to prove the protected activity was the sole or predominant factor.

Araujo, 708 F.3d at 158.  Rather, it is enough if the plaintiff can show that the protected activity was a factor "which alone or in combination with other factors, tends to affect in any way the outcome of the decision."  Id.   It is not necessary that the plaintiff show that the decision-maker had a retaliatory motive.  Id.  That protected activity was a contributing factor to an adverse employment action can be proven through circumstantial evidence of a temporal proximity, pretext, shifting explanations by the employer, antagonism or hostility toward the plaintiff's protected activity, the falsity of the employer's explanation or a change in the employer's attitude toward plaintiff after he/she engaged in protected activity.  See DeFRancesco v. Union RR Co., ARB No. 10-114, ALJ No. 2009-FRS-0 (ARB Feb. 29, 2012).

Plaintiff argues that there is ample evidence in this case to show that his protected activity was a contributing factor in the decision to terminate his employment.  After he made two reports in mid May 2010, Jaeb responded by repeatedly testing Plaintiff in early June 2010.  By June 9, 2010 - the day before Jaeb was to meet with Anheuser Busch to get them to replace the unsafe derail handle - Jaeb claimed that Plaintiff "fouled the tracks" which is a violation that subjected him to termination.  Plaintiff argues that a reasonable jury could find

19

that Jaeb's accusation was uncalled for, as Plaintiff took the necessary steps to avoid hazardous conditions before walking between the rails.  He also took all necessary protective actions before doing so, such as locking down the rail cars and ensuring the St. Croix crew or his own crew would not come on his track while he walked between the rails.  By contrast, Jaeb never investigated whether Plaintiff took such precautions before "fouling the tracks."

BNSF argues that Plaintiff's entire case is built on temporal proximity of the May 2010 reports and the subsequent, unrelated incident in which the Plaintiff committed one of the "Eight Deadly Decisions."  Reliance on temporal proximity will not support a retaliation claim under FRSA when the conduct for which the employee was disciplined had long been established as a violation of the employer's rules of conduct or the employee had been previously counseled for performance deficiencies.  See, e.g., Hervey v. County Koochiching, 527 F.3d 711, 723 (8th Cir. 2008) (finding that "[i]nsubordinate employees may not insulate themselves from discipline by announcing an intention to claim discrimination just before the employer takes action.")  Further, a plaintiff cannot establish a prima facie case of retaliation based on temporal proximity alone when the termination occurred two months after the alleged protected conduct.  See Kipp

v. Mo. Hwy & Transp. Comm'n, 280 F.3d 893, 897 (8th Cir. 2002) (finding that an interval of two months between plaintiff's complaint and her termination insufficient to support a causal link).

The Court finds that Plaintiff was terminated three months after he engaged in protected activity.  He was also on probation for a violation of a serious safety regulation when he participated in protected activity and when he was observed fouling the tracks in June 2010.  Plaintiff  knew that while on probation, further violations would subject him to possible disciplinary action, including termination.  BNSF submitted evidence which demonstrates that employees found to have fouled the tracks have consistently been discharged.

The Court further finds that BNSF has given a consistent basis for its decision to terminate Plaintiff's employment, and that Plaintiff can point to no evidence of pretext, shifting explanations, antagonism or hostility toward Plaintiff's protected activity, or a change in attitude toward Plaintiff after he engaged in protected activity.  As noted previously, the decision to terminate Plaintiff's employment was made by Ebel, which decision was based on the fact that Plaintiff had fouled the tracks while on probation.  Ebel's decision was thereafter subjected to review by higher-level management.  There is no evidence

in the record that the decision-makers were aware of Plaintiff's protected activity.

Based on the above, the Court finds that Plaintiff has failed to set forth a prima case of retaliation under the FRSA.

**B.    BNSF's Burden**

Even if Plaintiff put forth a prima facie case, BNSF has the opportunity to demonstrate by clear and convincing evidence that it would have made the same decision to terminate Plaintiff's employment in the absence of evidence that Plaintiff engaged in protected activity.  BNSF put forth evidence which demonstrates the decision to terminate Plaintiff's employment after his second serious rule violation within a twelve month period is consistent with BNSF's policies and past practices.  A violation of one of the Eight Deadly Decisions is treated strictly under BNSF's PEPA Policy, and when an employee commits a second serious violation while on probation, it is considered a dismissible violation.  (Wenger Decl., Ex. X (PEPA Policy at 2).)  A review of BNSF's past practices involving similarly situated employees indicates that within the six month period following Plaintiff's June 9, 2010 violation, two other employees were dismissed for committing the same serious rule violation.  (Id., Exs. EE and FF.)  There is no evidence that BNSF treated other similarly-situated employees

less harshly.  BNSF has submitted uncontroverted evidence which reflects a

consistent and neutral application of BNSF's disciplinary policies and

procedures.  (Id. Ex. D (Jaeb Dep. at 103-104, 215-16); Ex. I (Ebel Dep. at 93-97);

Ex. J (Lund Dep. at 36, 50-51).)

 Accordingly,

 **IT IS HEREBY ORDERED** that Defendant BNSF Railway Co.'s Motion for

Summary Judgment [Doc. No. 35] is **GRANTED**.  This matter is dismissed with

prejudice.

   **LET JUDGMENT BE ENTERED ACCORDINGLY**


Date: September 26, 2013



     s/ Michael J. Davis
     Michael J. Davis
     Chief Judge
     United States District Court